*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* K. KUCHARCZYK, Minor.

UNPUBLISHED
April 18, 2024

No. 366664
Huron Circuit Court
Family Division
LC No. 18-004671-NA

*In re* HARP/KUCHARCZYK, Minors.

No. 366891
Huron Circuit Court
Family Division
LC No. 18-004671-NA

Before: REDFORD, P.J., and CAMERON and LETICA, JJ.

PER CURIAM.

In these consolidated appeals, respondent-father and respondent-mother each appeal as of right the trial court's order, entered after a preliminary hearing, removing their minor child, KK, from their care and custody and placing the child with petitioner for supervision and care.[1] We affirm.

---

[1] Respondent-mother's appeal also challenges the "removal" of another child, CIH. However, CIH was in the custody of his father and that child was never removed from that placement. Although the court also entered an order authorizing the filing of a petition seeking jurisdiction over both KK and CIH with respect to respondent-mother, these appeals were filed pursuant to MCR 3.993(A)(1), which provides an appeal by right from "any order removing a child from a parent's care and custody." Indeed, respondent-mother's arguments on appeal are limited to the issue of removal. But because CIH was never in respondent-mother's care and custody and was never removed from his placement with his father, he is not within the scope of respondent-mother's appeal, which is limited to the trial court's removal of KK from her care and custody.

-1-

# I. FACTS AND PROCEEDINGS

The proceedings relevant to these appeals began with the filing of a supplemental petition in April 2023. At that time KK was living with respondents and respondent-mother's other child, CIH, was living with his father, but having visits with respondent-mother. After petitioner received allegations of physical abuse by respondent-mother, it sought respondent-mother's removal from the home. Respondent-mother initially agreed to leave, but then returned to the home. Consequently, petitioner filed another petition seeking removal of KK, jurisdiction over both children, and termination of both respondents' parental rights to KK and termination of respondent-mother's parental rights to CIH. After a preliminary hearing, the trial court authorized the petition and removed KK from respondents' home. The trial court found that KK was at substantial risk of harm, that removal of KK was necessary to protect his health and safety, and that no remedy other than protective custody was reasonably available to protect him. The trial court found that it was contrary to KK's welfare to remain in the home because respondents "continue to maintain a toxic, caustic relationship by engaging in near constant arguments in the presence of [KK]" that involved screaming, shouting, accusations, profanity, hysteria, and inappropriate emotional behavior. Jennifer Stahlbaum, respondent-father's sister, testified that she has had to repeatedly come to the home to pick up KK because respondent-father feared for KK's safety. Respondent-father allowed respondent-mother to come back to the home after she was ordered to be removed,[2] and witnesses testified about their concerns about various marks on KK's body. Respondents had previously been provided with multiple services, but have not shown benefit "due to continued, unstable family and household conditions, including unstable mental health conditions and due to the lack of improvement and regression in parenting skills." The trial court found that reasonable efforts were made to prevent KK's removal and listed all of the services that had been provided to respondents. Therefore, the court authorized the petition and ordered that KK be taken into protective custody and placed with petitioner for care and supervision.

# II. DISCUSSION

Both respondents argue that the trial court erred by removing KK from their home. We disagree.

"This Court reviews a trial court's factual determinations for clear error. Clear error requires that the reviewing court be left with a firm and definite conviction that a mistake has been made." *In re Williams*, 333 Mich App 172, 178; 958 NW2d 629 (2020) (quotation marks and citations omitted). "Even if an error occurred, this Court will not disturb the trial court's order unless it would be 'inconsistent with substantial justice' to permit the order to stand." *Id.*, quoting MCR 2.613(A) and *In re TC*, 251 Mich App 368, 371; 650 NW2d 698 (2002). This Court reviews de novo the interpretation and application of statutes and court rules. *In re Williams*, 333 Mich App at 178.

---

[2] Respondent-mother waived her right to a hearing and she agreed to leave the home after acknowledging that "some or all of the allegations" contained in petitioner's motion to remove her from the home were true.

Upon receiving a petition to take jurisdiction over a child, "the trial court must hold a preliminary hearing and may authorize the filing of the petition upon a finding of probable cause that one or more of the allegations are true and could support the trial court's exercise of jurisdiction under MCL 712A.2(b)." *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019), citing MCR 3.965(B). "At the preliminary hearing, the court must decide whether to authorize the filing of the petition and, if authorized, whether the child should remain in the home, be returned home, or be placed in foster care pending trial." *In re Benavides*, 334 Mich App 162, 167; 964 NW2d 108 (2020) (quotation marks and citation omitted). Regarding pretrial placement, MCR 3.965(C) provides, in relevant part:

> (2) *Criteria.* The court may order placement of the child into foster care if the court finds all of the following:
>
> (a) Custody of the child with the parent presents a substantial risk of harm to the child's life, physical health, or mental well-being.
>
> (b) No provision of service or other arrangement except removal of the child is reasonably available to adequately safeguard the child from the risk as described in subrule (a).
>
> (c) Continuing the child's residence in the home is contrary to the child's welfare.
>
> (d) Consistent with the circumstances, reasonable efforts were made to prevent or eliminate the need for removal of the child.
>
> (e) Conditions of child custody away from the parent are adequate to safeguard the child's health and welfare. [See also MCL 712A.13a(9) (listing the same five conditions).]

In *In re Benavides*, 334 Mich App at 168, this Court explained:

> If the trial court orders placement of the child in foster care, it must make explicit findings that "it is contrary to the welfare of the child to remain at home," MCR 3.965(C)(3), and "reasonable efforts to prevent the removal of the child have been made or that reasonable efforts to prevent removal are not required," MCR 3.965(C)(4).

And, as explained in *In re Williams*, 333 Mich App at 183:

> The preponderance of the evidence standard applies to cases where the court is merely assuming jurisdiction over the child and not terminating the parent's rights in that child. A trial court is generally not obligated to articulate extensive findings regarding every conceivable detail. However, when a statute or court rule requires factual findings as to an enumerated list of factors, the trial court must make a record of its findings as to each and every factor sufficient for this Court to conduct a meaningful review. [Quotation marks and citations omitted.]

In *In re Williams*, 333 Mich App at 183-185, this Court concluded that the trial court made "minimal but adequate" findings regarding Factors (a) and (c), failed to make any findings regarding Factors (b) and (d), and made "ambiguous and incomplete" findings regarding Factor (e). This Court stated:

> The trial court did not appear to consider whether removal of LZW was the only available option to keep LZW safe, nor did it appear to consider whether any efforts had been made to keep LZW in respondent's care. Furthermore, the trial court did not appear to consider whether LZW's removal might be more emotionally traumatic to her than keeping her in respondent's care. Although not removing a child from an unfit parent can also be hazardous to the child's health, it is well recognized as public policy that separation of children from parents should be avoided if reasonably feasible. Furthermore, the decision to remove a child can substantially affect the balance of the child protective proceedings even when the initial concerns are eventually determined to have been overstated. [*Id.* at 184 (quotation marks and citations omitted).]

This Court concluded that because the trial court ignored the mandates of the court rule and statute, its removal order was inconsistent with substantial justice. *Id.* at 184-185.

In this case, the question is whether the trial court made adequate findings supported by the record regarding each of the five factors in MCR 3.965(C)(2) and MCL 712A.13(a)(9). With regard to Factors (a) and (b), the trial court merely quoted the court rule and statute, without making additional findings. While respondents contend that merely checking the box on the removal order is insufficient, the trial court made findings that supported Factors (a) and (b) while addressing another factor. In addressing Factor (c), the trial court found that respondent-mother was removed from the home because she presented a substantial risk of harm and witnesses testified regarding concerns about marks on KK's body. The trial court found that respondent-mother left the home, but she later returned. Despite the previous provision of numerous services, the court also found that they were not successful given the "continued unstable family and household conditions, including unstable mental health conditions, and due to the lack of improvement and regression in parenting skills."

These findings are not clearly erroneous and are supported by the testimony at the preliminary hearing. Regarding Factor (a), Stahlbaum testified that she had received numerous calls from respondent-father stating that KK was unsafe and asking Stahlbaum to pick the child up. Respondent-father had informed Stahlbaum that respondent-mother was pinching KK and squeezing his head. Respondent-father said he had to stay in the bathroom when respondent-mother bathed KK because he was concerned about KK's safety. Moreover, respondent-father said that he rarely left KK alone in a room with respondent-mother because it is not safe and KK will scream. A Children's Protective Services maltreatment and care worker testified that respondent-father similarly told her that he was fearful for the safety of both children when they are with respondent-mother. Respondent-father said he has heard KK screaming when he is in a room alone with respondent-mother, he has seen red marks on KK's legs, and he assumed respondent-mother pinched KK. Respondent-father also said that when respondent-mother becomes frustrated, she yanks KK from respondent-father's arms. Respondent-mother would call the children derogatory names. Respondent-father said that KK starts to shake when respondent-

-4-

mother is screaming. KK had a medical examination and the doctor reported seeing approximately seven bruises on each leg, which were concerning because of their location and different stages of healing. The child also had a bruise on his back. The caseworker, Shannon Trowhill, testified that she observed a mark on KK's finger and a scrape on his neck. Although respondent-father had not actually witnessed respondent-mother pinch or cause marks to KK, he observed her yanking KK from his arms. Trowhill also described frequent verbal and emotional domestic violence between respondents, and respondent-father reported to her that respondent-mother had punched and slapped him in the face. Given respondent-mother's behavior, combined with the marks on KK and the fact that respondent-father was not suspected to be the perpetrator of the abuse, the trial court did not clearly err by finding that KK would be at substantial risk of harm in respondent-mother's care.[3] Moreover, while respondent-father frequently called Stahlbaum, the evidence showed that he could not fully protect KK from respondent-mother when KK was in their care. Thus, the trial court did not clearly err by also finding that KK was at a substantial risk of harm in respondent-father's care.

With regard to Factor (b), there had been numerous safety plans in place, but they did not adequately safeguard KK. Although respondent-father would frequently call Stahlbaum to pick up KK, this did not prevent KK from receiving the injuries noted or from witnessing respondents' arguments or respondent-mother's behavior. The fact that the safety plans were not working is shown by petitioner's decision to remove respondent-mother from the home, to which respondent-mother initially agreed. However, days after her removal, respondent-father allowed her to return to the home. Respondent-father told his sister that he wanted to choose respondent-mother over KK. Respondent-father also contacted Trowhill, stating that he would not participate in services without respondent-mother and wanted KK removed from the home. Accordingly, removal of KK was the only remaining option.

With regard to Factor (c), the trial court delineated on the record and in its order the reasons why it was contrary to KK's welfare to remain in the home. The trial court found that it was contrary to the welfare of KK to remain in the home because respondents "continue to maintain a toxic, caustic relationship by engaging in near constant arguments" in KK's presence. Respondents' conduct included screaming, shouting, accusations, profanity, hysteria, and inappropriate emotional behavior. Stahlbaum had to repeatedly come to the home to pick up KK because respondent-father feared for KK's safety. Respondent-father also allowed respondent-mother to return to the home after she was ordered to be removed, and witnesses testified regarding their concerns about various marks on KK's body. Respondents were provided with multiples services, but they had not shown benefit.

Respondents agree that the trial court made specific findings regarding this factor. But they argue that the court's findings are clearly erroneous and the court failed to consider whether removal would be more traumatic than keeping KK in the home. The trial court's findings are not clearly erroneous. There was testimony regarding the frequent arguments between respondents

---

[3] As petitioner additionally notes, respondent-mother previously admitted that some or all of the allegations in the petition that sought her removal from the home were correct. Thus, she admitted that she was a risk of harm to KK.

and the use of profanity in front of the children. Respondent-mother often became upset, yelled at KK, and had hit respondent-father. Stahlbaum testified that respondent-father repeatedly called her to pick up KK because he feared for KK's safety. There was also testimony regarding the marks on KK's body, and respondents' failure to benefit from services, despite some periods of progress.

With regard to Factor (d), the trial court listed the services that had been provided to respondents, which included:

> A Chance for Change, Forensic Fluids, Supervised Parenting Time, Unsupervised Parenting Time, Outpatiend [sic] Therapy/substance Abuse Treatment as [sic] List Psychological, Family Skills, Positive Alternatives, Mi Works, Blue Water Center for Independent Living, Access Alliance, Families Together Building Solutions, Averhealth, Probation, Spectrum, Family Reunification Program, Couples Counseling through Lloyd Human Services, and Foster Care Case Management.

Respondents argue that merely listing the services provided is not sufficient and the trial court was required to determine whether the services were reasonable and whether respondents had benefited from the services provided. However, the trial court listed the services as "reasonable efforts," thereby concluding that they were reasonable. Although the witnesses at the preliminary hearing did not name each of these services, respondent-mother stipulated to this paragraph in support of the contrary-to-the-welfare findings. Further, witnesses testified that respondents participated in counseling, couples therapy, substance-abuse services, and a reunification program. To the extent that the trial court was required to determine whether respondents benefited from the services, in discussing Factor (c), the trial court found that neither respondent "demonstrated benefit from the services due to continued, unstable family and household conditions, including unstable mental health conditions and due to the lack of improvement and regression in parenting skills." Again, there was evidence that respondents failed to benefit from services, despite some periods of progress. Respondents continued to argue, respondent-father continued to fear for KK's safety with respondent-mother, and KK had marks and bruises on his body. The trial court's findings are not clearly erroneous.

Finally, with regard to Factor (e), respondents are correct that the trial court failed to make any findings on the record and failed to check the relevant box on the order. In addressing Factor (c), the trial court found that KK was originally placed with Stahlbaum in July 2022, but the court did not make any findings regarding whether the conditions with Stahlbaum were adequate. As petitioner observes, however, respondent-father routinely contacted Stahlbaum to take KK and agreed to placement with her, demonstrating that placement with Stahlbaum was adequate. We agree that the record establishes that the conditions of KK's custody with Stahlbaum were adequate to safeguard his health and welfare. Respondent-father often called Stahlbaum to take KK when respondent-father believed that KK was not safe in the home. Respondents also agreed to voluntary placement of KK with Stahlbaum. Stahlbaum testified that KK cries when she leaves him with respondent-father and respondent-mother is there. This evidence supports that the

conditions with Stahlbaum were adequate. Even though the trial court failed to make explicit findings regarding Factor (e), reversal is not required because it would not be "inconsistent with substantial justice" to permit the order to stand. MCR 2.613(A).

Affirmed.

/s/ James Robert Redford
/s/ Thomas C. Cameron
/s/ Anica Letica